IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **CHEMSTATION INTERNATIONAL INC.**<br>c/o Thompson Hine LLP<br>10 W. Second Street<br>2000 Courthouse Plaza N.E.<br>Dayton, Ohio 45402,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>**TDMC ENTERPRISES, INC.**<br>c/o Statutory Agent<br>Tracey J. Felder<br>4725 Bakers Ferry Road<br>Atlanta, GA 30326<br><br>and<br><br>**CHARLES E. SMITH**<br>314 Saint Pauls Court<br>Stockbridge, GA 30281-1092<br><br>and<br><br>**DOUGLAS O. SMITH**<br>370 Great Southwest Pkwy., Suite K<br>Atlanta, GA 30336<br><br>　　　　　Defendants. | CIVIL ACTION NO. 3:08-cv-478<br><br>**VERIFIED COMPLAINT FOR<br>INJUNCTIVE RELIEF AND<br>DAMAGES WITH JURY DEMAND<br>ENDORSED HEREON** |

Plaintiff ChemStation International Inc., for its Complaint against Defendants alleges as follows:

### THE PARTIES

1.　Plaintiff ChemStation International Inc. ("ChemStation") is a franchisor and an Ohio corporation with its principal place of business located in Montgomery County, Dayton, Ohio.

2. Defendant TDMC Enterprises, Inc. ("TDMC") is a franchisee of ChemStation and a Georgia Corporation with its principal place of business located at 370 Great Southwest Pkwy., Suite K, Atlanta, GA 30336.

3. Defendant Charles E. Smith ("Chuck Smith") is an individual serving as the President of TDMC and residing, upon information and belief, at 314 Saint Pauls Ct., Stockbridge, GA 30281.

4. Defendant Douglas O. Smith ("Doug Smith") is an individual serving as the Vice President of TDMC. Doug Smith's residential address is unknown, but upon information and belief, he can be located at his place of employment at TDMC's principal place of business.

## JURISDICTION AND VENUE

5. This Court has jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. §1332, in that the parties do not share common state citizenship and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

6. Venue is proper in this District pursuant to 28 U.S.C. §1391(a).

## THE CHEMSTATION BUSINESS

7. ChemStation is the owner of a unique and proprietary system for the selling, mixing and distributing of industrial strength cleansers and certain proprietary formulations for such cleansers (collectively, the "ChemStation Business"). ChemStation is also in the business of franchising the ChemStation Business and has ChemStation franchisees, each subject to the ChemStation franchise agreement, located across the United States. ChemStation and the ChemStation franchisees serve as the exclusive means for distribution of ChemStation's products and services.

8. Each franchisee must execute ChemStation's franchise agreement. ChemStation agrees, pursuant to the franchise agreement, to provide its franchisees with certain training,

know-how, equipment, concentrates, mixing formulas, and various assistance. ChemStation also develops new formulations from time to time. In exchange, the franchisees agree to use their best efforts to market and sell ChemStation products.

9. As part of the ChemStation Business, ChemStation has developed and continues to develop proprietary concentrates ("Proprietary Concentrates") to be mixed by the franchisees in proprietary formulations to create ChemStation's industrial strength cleansers ("Cleansers"), which are then distributed through the ChemStation franchise system.

10. The chemical content, processing techniques, and exact nature of the Proprietary Concentrates, are not disclosed outside ChemStation or even to ChemStation franchisees. The Proprietary Concentrates are known to ChemStation franchisees only by an internal name, for example—"Green."

11. Instead, ChemStation franchisees purchase Proprietary Concentrates from ChemStation and are provided mixing formulas by ChemStation to prepare the Cleansers. For instance, ChemStation franchisees may purchase "Green," "Red," and "Blue" Proprietary Concentrates from ChemStation and are then instructed to mix one part Green, three parts Red, and two parts Blue to create a particular Cleanser for a particular application.

12. ChemStation heavily guards and protects the proprietary information regarding its Proprietary Concentrates, Cleansers, and the chemical content thereof from its franchisees and the world.

13. Non-employees are not permitted access to the chemical compositions or other information concerning the Proprietary Concentrates and Cleansers. This information is maintained in a secure facility and access is restricted. Further, all ChemStation employees with access to such information are required to execute contracts containing confidentiality and non-competition clauses.

14. Further, ChemStation franchisees and their officers and employees are well aware of the confidential and proprietary nature of the Proprietary Concentrates, Cleansers, and other ChemStation information based on language in the ChemStation franchise agreements and requisite owner and employee non-disclosure agreements.

### **TDMC'S OBLIGATIONS AS A CHEMSTATION FRANCHISEE**

15. On or about February 1, 2002, ChemStation and TDMC entered into a ChemStation franchise agreement, which was later amended by a letter agreement dated April 3, 2008 (the ChemStation franchise agreement with TDMC, as amended, is referred to as the "Agreement"), under which ChemStation agreed to let TDMC use ChemStation's proprietary system for mixing commercial cleansers from the Proprietary Concentrates, in exchange for various promises by TDMC, including, but not limited to the payment of royalties and the use of best efforts to sell ChemStation Products. (A copy of the Agreement is attached as "Exhibit A.")

16. In its capacity as a franchisee, TDMC has access to the Proprietary Concentrates and Cleansers, but not their confidential and proprietary chemical compositions.

17. Pursuant to Sections 6.2, 6.7, 6.13, 14.1 and 15.1 of the Agreement, TDMC is required to purchase all Proprietary Concentrates from ChemStation and no other entity is to have knowledge of the contents of the Proprietary Concentrates. (Agreement §§ 6.2, 6.7, 6.13, 14.1, 15.1.)

18. Pursuant to Section 6.7 of the Agreement, TDMC expressly agreed to refrain from using ChemStation's Information for any purpose other than the ChemStation Business and to keep such information confidential:

> 6.7   Franchisee, the officers, directors and shareholders of a corporate Franchisee, the partners of a Franchisee, which is a partnership, and the members and managers of a Franchisee which is a limited liability company shall treat as confidential any operating manuals provided by Franchisor and any other instructions, trade secrets, know-how and other confidential information of

>Franchisor (the "Information") and shall not at any time before or after the termination of the Agreement use any such Information except in the operation of Franchisee's ChemStation Business prior to termination, nor divulge any such Information to any person, firm or corporation except to Franchisee's employees or agents for use solely in the operation of Franchisee's ChemStation Business. Franchisee shall cause Franchisee's employees and agents to keep such Information confidential and shall require al employees and agents who obtain access to any of the Information to execute and deliver to Franchisor and Franchisee a Nondisclosure Agreement in the form of <u>Schedule 6.7</u> attached hereto. All such Information furnished by Franchisor in connection with the business of Franchisor or Franchisee will be and will remain the property of Franchisor and, if in tangible form, shall be returned to Franchisor upon termination of this Agreement for any reason. Franchisee and its officers, directors, shareholders and partners shall not copy, duplicate, record or otherwise reproduce all or any part of material containing the Information and shall prevent Franchisee's employees and agents from doing so.

(Agreement § 6.7.)

19. More particularly, pursuant to Section 6.13 of the Agreement, TDMC promised <u>not to</u>: "(a) use or attempt to use chemical concentrates or solutions in the mixing of Cleansers in lieu of or in substitution for Proprietary Concentrates specified by Franchisor, (b) <u>analyze, attempt to analyze or arrange for a third-party to analyze Proprietary Concentrates in order to determine the formulas or specifications therefor</u>, or (c) change, alter or modify the formulas or mixing procedures for Cleansers or written documentation supplied by Franchisor with regard to Concentrates or Cleansers (including, but not limited to, material safety data sheets, labels, shipping papers or other written documentation." (Emphasis added.)

### THE SMITHS' OBLIGATIONS PURSUANT TO THE FRANCHISE AGREEMENT AND THEIR NONDISCLOSURE AGREEMENTS

20. Pursuant to Section 6.7 of the Agreement, TDMC agreed to require "all employees and agents who obtain access to any of the Information to execute and deliver to Franchisor and Franchisee a Nondisclosure Agreement in the form of <u>Schedule 6.7</u> attached" to the Agreement.

21. Chuck Smith executed the Employee Nondisclosure Agreement attached as Schedule 6.7 of the Agreement.

22. TDMC agreed to require Doug Smith to also execute an Employee Nondisclosure Agreement attached as Schedule 6.7 of the Agreement.

23. Pursuant to the Nondisclosure Agreement attached as Schedule 6.7 of the Agreement:

> 1. Employee will not use or disclose during or after his employment by Employer, except as specifically authorized in writing by ChemStation, other than in the performance of his duties for Employer, any Licensed Information, that he has or will acquire during his employment by Employer. The term "Licensed Information" as used in this Agreement means (i) confidential information, including without limitation, operating manuals, trade secrets, know-how, customer lists and other information received under confidential conditions, from Employer or ChemStation in regard to the ChemStation System; and (ii) other technical, business or financial information, the use or disclosure of which might reasonably be construed to be contrary to the interest of Employer or ChemStation. When any Licensed Information becomes generally available to the public other than by Employer's or Employee's acts or omissions, it is understood that Employee will no longer be subject to this restriction in regard to the Licensed Information that so becomes public.
>
> 2. Employee will not copy, duplicate, record or otherwise reproduce all or any part of any material containing the Licensed Information.

24. In addition, Chuck Smith also executed an "Owner/Executive Nondisclosure and Compliance Agreement," (the "Owner's Agreement"), which is attached to the Agreement as Exhibit D.

25. The Owner's Agreement, similar to the Agreement and Employee Nondisclosure Agreement, requires Chuck Smith to protect and not disclose ChemStation's confidential and proprietary information. (Owner's Agreement ¶ 1.)

## DEFENDANTS AGREED THAT CHEMSTATION IS ENTITLED TO PROTECT ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION IN COURT

26. Pursuant to the terms of the Agreement, TDMC agreed that ChemStation would have the right to seek remedies through the courts, in law or in equity, including to seek injunctive relief, to enforce certain sections of the Franchise Agreement and to otherwise "protect its trademarks, trade names, trade secrets and/or any other confidential and/or proprietary information." (Agreement § 27.3.)

27. Similarly, pursuant to the terms of the Employee Nondisclosure Agreement and the Owner's Agreement, the Smiths understood and agreed that ChemStation would suffer irreparable harm "in the event of a breach or threatened breach" by them "of any provision of this agreement," entitling ChemStation to an injunction restraining them "from commission of such breach." (Employee Nondisclosure Agreement ¶ 3; Owner's Agreement ¶ 4.)

28. Further, pursuant to the Agreement, Ohio law governs exclusively and the exclusive venue for the resolution of disputes is to be located in Ohio. (Agreement § 27.1.)

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

29. ChemStation incorporates the allegations of ¶¶1 through 28, inclusive, as if rewritten into this paragraph.

30. ChemStation has been informed that in approximately March 2008, a then employee (now former employee) of TDMC was instructed by the Smiths to gather samples of several Proprietary Concentrates and to give those Proprietary Concentrates to Tom Grimaldi, an employee of a distributor called Essential Ingredients, Inc. ("Essential").

31. Essential is a distributor of Vitech International, Inc. ("Vitech"), a competitor of the ChemStation Business.

32.     ChemStation has also been informed that, after following the instructions of the Smiths, the employee gathered samples of approximately 15 different Proprietary Concentrates, including Navy, Pink, Beige, Goldenrod, Teal, and Red.

33.     As instructed by the Smiths, the employee gave these samples to Mr. Grimaldi at the TDMC office in Atlanta, Georgia.

34.     Mr. Grimaldi told the employee that, once the deformulation process revealed the composition of the Proprietary Concentrates, Vitech would tell TDMC what products they had to replace the Proprietary Concentrates.

35.     The employee, in fact, witnessed a phone conversation between TDMC and Vitech, during which the two companies discussed a plan to deformulate the Proprietary Concentrates at a Vitech facility in Canada.

36.     The employee has informed ChemStation that the Smiths' purpose for providing the Proprietary Concentrates to Essential was so that they could be analyzed in order to reverse engineer the formulations for TDMC, which would allow the Smiths and TDMC to cut ChemStation out and put ChemStation "out of business."

37.     Furthermore, the employee has informed ChemStation that the reverse engineering and analysis was to be performed by a direct competitor of the ChemStation Business.

38.     Defendants' acts are in direct violation of the Agreement, the Employee Nondisclosure Agreement, the Owners' Agreement, and trade secret laws.

39.     As a proximate result of Defendants' actions, the ChemStation Business has been damaged and will continue to be damaged in an amount currently unknown but reasonably expected to exceed $75,000.00.

40. As a further consequence, TDMC has irreparable breached the Agreement and ChemStation, therefore, seeks a declaration that the Agreement is terminated.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract—Injunctive Relief)

41. ChemStation incorporates the allegations of ¶¶1 through 40, inclusive, as if rewritten into this paragraph.

42. Pursuant to the Agreement, Defendants agreed that while "[a]ny dispute, controversy or claim arising out of or relating to this Agreement or the breach thereof will be settled by arbitration," "Franchisor shall at all times have the right to seek such remedies through the courts, at law or in equity, or otherwise as it deems necessary or desirable, including, without limitation , injunctive relief, . . . to protect its trademarks, trade names, trade secrets and/or any other confidential and/or proprietary information." (Agreement §§ 27.2, 27.3.)

43. Pursuant to the Employee Nondisclosure Agreement and the Owners' Agreement, Defendants agreed that in the event of their breach, ChemStation is entitled to injunctive relief:

> 3. In recognition of the irreparable harm that a violation of this agreement would cause to the Employer and/or ChemStation, Employee agrees that in addition to any other relief afforded by laws, in the event of a breach or threatened breach by Employee of any provision of this agreement, Employer and/or ChemStation shall be entitled to an injunction restraining Employee from commission of such breach. Nothing herein contained shall be construed as prohibiting Employer and/or ChemStation from pursuing other remedies available for such breach or threatened breach, including the recovery of money damages.

(Employee Nondisclosure Agreement ¶ 3; <u>see also</u> Owner's Agreement ¶ 4.)

44. Defendants have materially breached the Agreement, the Employee Nondisclosure Agreements and the Owners' Agreement by providing Proprietary Concentrates to a third party, indeed a competitor, to be analyzed and reverse engineered.

45. ChemStation is, therefore, entitled to temporary, preliminary and permanent injunctive relief requiring Defendants to cease and desist from any such activities and from any use of any information obtained from such activities.

### THIRD CLAIM FOR RELIEF
(Violation of Ohio Trade Secrets Act)

46. ChemStation incorporates the allegations of ¶¶1 through 45, inclusive, as if rewritten into this paragraph.

47. ChemStation's confidential and proprietary information has independent economic value because it is not generally known to the public, is not readily ascertainable by proper means and is the subject to efforts that are reasonable under the circumstances to maintain its secrecy.

48. Defendants, by providing Proprietary Concentrates to Essential to be reverse engineered, have misappropriated, or at least attempted to misappropriate ChemStation's confidential and proprietary information and trade secrets.

49. Upon information and belief, Defendants are using or are attempting to use the analysis of the Proprietary Concentrates to substitute and potentially allow other franchisees to substitute other products and materials for Proprietary Concentrates and Cleaners.

50. By using or attempting to use ChemStation's confidential and proprietary information, Defendants have misappropriated that information for their own benefit and profit.

51. As a result of Defendants' misappropriation, ChemStation may lose profits and integrity in the ChemStation Business and its franchise system.

52. Defendants' misappropriation of ChemStation's confidential and proprietary information was willful and malicious, with the express purpose of putting ChemStation "out of business."

53.     Pursuant to Ohio Rev. Code § 1333.62, ChemStation is entitled to an order enjoining Defendants to prevent further or attempted use by Defendants of ChemStation's confidential and proprietary information.

54.     Pursuant to Ohio Rev. Code § 1333.63, ChemStation is entitled to compensatory damages and punitive damages of three times its compensatory damages.

55.     Pursuant to Ohio Rev. Code § 1333.64, ChemStation is entitled to recover its attorneys fees.

56.     As a proximate result of Defendants' actions, ChemStation may lose profits and may be damaged, and will continue to be damaged, in an amount currently unknown but reasonably expected to be in excess of $75,000.00.

**WHEREFORE**, Plaintiff ChemStation International Inc., demands judgment in its favor and against Defendants TDMC Enterprises, Inc., Charles E. Smith, and Douglas O. Smith as follows:

1.     On the First Claim for Relief, for compensatory damages in excess of $75,000, plus interest, for a declaration that Defendants' actions are in breach of the Agreement, Employee Nondisclosure Agreements, and Owners' Agreement, and for a declaration that Defendants' breach is irreparable and the Agreement is, therefore, terminated;

2.     On its Second Claim for Relief, for an Order enjoining Defendants from using or attempting to use, analyze or attempting to analyze ChemStation's confidential and proprietary information, including, but not limited to ChemStation Proprietary Concentrates and Cleansers;

3.     On its Third Claim for Relief, for compensatory and punitive damages in excess of $75,000, plus interest, plus attorneys fees;

4.     For the costs of the within action; and

5.     For any other and further relief to which it may be entitled.

        /s/Victoria L. Nilles
        Christine M. Haaker (#0063225)
        Phone: 937.443.6822
        Christine.Haaker@ThompsonHine.com
        Victoria L. Nilles (#0076616)
        Phone: 937.443.6808
        Victoria.Nilles@ThompsonHine.com
        THOMPSON HINE LLP
        2000 Courthouse Plaza, N.E.
        P.O. Box 8801
        Dayton, Ohio 45401-8801
        Facsimile: (937) 443-6830

        Attorneys for Plaintiff
        ChemStation International Inc.

## JURY DEMAND

Pursuant to Ohio Civ. R. 38, Plaintiff ChemStation International Inc. demands a trial by jury on all issues.

/s/Victoria L. Nilles
Christine M. Haaker (#0063225)
Victoria L. Nilles (#0076616)

## VERIFICATION

STATE OF OHIO            )
                         ) SS:
COUNTY OF MONTGOMERY     )

Jeffrey P. Purks, as Vice President of ChemStation International Inc., verifies that he has read the foregoing Verified Complaint for Injunctive Relief and that the statements and allegations are true and correct to the best of his knowledge, information, and belief.

_____
Jeffrey P. Purks

Sworn to and subscribed before me, this the 22nd day of December, 2008.

_____
Notary Public

MILDRED M. NEWMAN, Notary Public
In and for the State of Ohio
My Commission Expires Sept. 8, 2012